THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY V. ELLA D. COLTRANE.

No. 16,024.

SYLLABUS BY THE COURT.

ACCORD AND SATISFACTION—*Release of Claim for Personal Injuries.* Under all the circumstances shown by the findings of fact in this case, *held,* that the release in writing signed by the plaintiff acknowledging full satisfaction of all claims for personal injuries bars her right to recover, and entitles the defendant to judgment in its favor for costs.

Error from Shawnee district court; ALSTON W. DANA, judge. Opinion filed June 5, 1909. Reversed.

STATEMENT.

ELLA D. COLTRANE recovered a judgment against the defendant for the sum of $1710 for injuries alleged to have been received while a passenger on one of its trains. Defendant prosecutes error.

The action was begun in the district court of Shawnee county, August 10, 1905. In her petition plaintiff claimed that she was injured on the 27th day of August, 1903, while.a passenger on a train returning from Los Angeles, Cal., to Albuquerque, N. M., her injuries being received while in a Pullman car which was standing on a side-track at Williams, Ariz. As plaintiff was changing from one seat to another the train was backed down against the Pullman car suddenly, causing her to be thrown to the floor of the car, from which fall she was severely shocked, strained, and injured. The defendant answered setting up a release executed by the plaintiff at Albuquerque eight days after the injuries were received. A copy of the release attached to the answer reads as follows:

"The Atchison, Topeka & Santa Fe Railway Company, Coast Lines.

"To Ella D. Coltrane, Dr.

1903.·　　　　　　　　　　　Albuquerque, N. M.

"September 4. For and in full release, discharge and satisfaction of all claims, demands or causes of action arising from or growing out of all personal injuries sustained by me while a passenger on No. 2, and caused by the rough handling of said train at Williams, Ariz., on August 27, 1903, as well as any and all claims of whatsoever kind or character I may have against said railway company prior hereto and up to and including the date hereof.

"Settled in full for $10.50.

"Received of the Atchison, Topeka & Santa Fe Railway Company (Coast Lines) ten and 50-100 dollars, in full payment of the above claim. In consideration of the payment of said sum of money, I, . . . of Albuquerque, in the county of Bernalillo and territory of New Mexico, hereby remise, release and forever discharge said company of and from all manner of actions, causes of action, suits, debts and sums of money, dues, claims and demands whatsoever, in law or equity, which I have ever had or now have against said company, by reason of any matter, cause or thing whatever, whether the same arose upon contract or upon tort.

"I have read the above voucher and fully understand the same.

"In testimony whereof, I have hereunto set my hand, this 4th day of September, 1903.

"Witness:                         ELLA D. COLTRANE."
    Bessie Bowden.
    P. W. Zimmerman."

In her reply the plaintiff alleged that after her injury, and while she was yet in a weak and nervous condition and suffering from its effects, one Zimmerman, a local agent of the defendant, called upon her, and at his instance and request she gave him an account of her trip and stated to him that upon the first night of her ride in California the Pullman berth in which she was riding had been sold to another party, by reason of which she was deprived of her rest for the greater part of the night; that she detailed to him the incident of the collision and her discomfort caused thereby; that at that time she was wholly ignorant of having sustained any material or permanent injuries; that the agent urged her to prepare a claim for damages against the defendant, but she refused to present any claim whatever, on the ground that she believed at that time that she had not sustained any injuries; that thereupon the local agent, with intent to deceive and defraud her and thus obtain a release and receipt, while at that time she was making no such claim, proposed to return to her the money she had paid on account of Pullman fare and urged her to accept the same, which she agreed to do; that thereupon the agent left her residence and shortly afterward returned with a check for the Pullman fare and a voucher, or receipt, which he claimed was for the purpose of showing that the Pullman fare had been returned to her; that the agent at that time, "with intent to deceive and defraud this plaintiff, fraudulently stated, represented and pretended that the said paper, or receipt, was merely a voucher showing that said plaintiff had received back

her Pullman fare, and that the execution of said paper, or receipt, was a mere matter of form and red tape"; that, relying upon these statements, and believing the same to be true, she signed her name "to the receipt presented to her at the time, and received from said defendant's agent her Pullman fare, and no more"; that if she had known the receipt was intended by the defendant's agent as a release or a receipt for damages she would not have signed it.

An amended answer set up a copy of a draft for $10.50, payable to the order of the plaintiff, drawn by the agent, Zimmerman, which was indorsed by the plaintiff in her own handwriting. The amended reply averred that at the time she signed the receipt, in the manner set out in her original reply, "and as a part of the same transaction the agent of the said defendant company immediately thereafter presented to this plaintiff a check, requesting her to indorse the same, saying that he would pay her the money thereon, and that she did then and there indorse the said check by writing her name across the back thereof, and thereupon received from the said agent the sum of $10.50 in cash, relying upon the representations made by the said defendant's agent which induced her to sign the receipt as alleged and set out in her original reply."

In addition to the general verdict the jury made the following special findings of fact:

"(1) Ques. Did the plaintiff, on September 4, 1903, write with her own hand in the vouchers marked 'Exhibits 2 and 4' and introduced in evidence the following words: 'I have read the above voucher, and fully understand the same'? Ans. Yes.

"(2) Q. Could the plaintiff, by the exercise of ordinary care, have informed herself of the contents of the vouchers mentioned in the last question? A. Yes.

"(3) Q. Were each of said vouchers signed by plaintiff, one after the other, and did she write the words therein mentioned in question 1? A. Yes.

"(4) Q. Did the plaintiff, after signing the two vouchers mentioned, receive a check or draft from Zimmerman for $10.50 which was introduced in evidence, and did she indorse the same by writing her name on the back thereof before it was paid? A. Yes.

"(5) Q. What was the amount of Pullman fare paid by the plaintiff, Ella D. Coltrane, from Pasadena, Cal., to Albuquerque, N. M., on or about the 27th day of August, 1903? A. We do not know from the evidence.

"(6) Q. To whom did she pay this amount? A. Paid to Miss Kirby.

"(7) Q. How long was it after her alleged injury at Williams, Ariz., that she signed the vouchers introduced in evidence? A. Eight days.

"(8) Did Zimmerman make any statement to plaintiff when he delivered to her the draft or check for $10.50 that the same was given to her in payment of her Pullman fare? A. No."

"(10) Q. Before going to Albuquerque, N. M., had the plaintiff taught in the schools at Lawrence, Kan., for a period of eleven years? A. Yes.

"(11) Q. After going to Albuquerque, N. M., did the plaintiff teach in the schools of that city for a period of nine years? A. Yes.

"(12) Q. Before commencing to teach in the schools of Lawrence, Kan., had the plaintiff graduated from the University of Kansas? A. Yes.

"(13) Q. Did the plaintiff, on the 4th day of September, 1903, sign the release and settlement introduced in evidence and marked 'Exhibit 2'? A. Yes.

"(14) Q. If you answer the last above question 'Yes,' please state if she wrote in said release and settlement the following words: 'I have read the above voucher and fully understand the same.' A. Yes.

"(15) Q. Was the plaintiff able to read the release that she signed, and to understand it, if she read it? A. Yes.

"(16) Q. At the time of signing the release was the eyesight of the plaintiff good? A. Yes.

"(17) Q. Was the plaintiff in the possession of her faculties when she signed the release? A. Yes.

"(18) Q. Did the plaintiff have an opportunity to read the release before she signed it, if she wished or desired to read the same? A. Yes.

21—80 KAN.

"(19) Q. Was the plaintiff in any way prevented from reading the release in question before signing it? A. Yes, by the statements of Mr. Zimmerman.

"(20) Q. If you answer the last-above question 'Yes,' then please state in answer to this question in what way and on what account the plaintiff was prevented from reading the release. A. By the statements of Mr. Zimmerman.

"(21) Q. After signing the release in question, did Zimmerman hand to the plaintiff a sight draft, payable to the order of the plaintiff, for the sum of $10.50, and dated September 4, 1903? A. Yes.

"(22) Q. Did the plaintiff write her name across the back thereof, and draw and receive the money thereon? A. Yes.

"(23) Q. Did the sight draft contain the following: 'in payment of all personal injuries sustained at Williams'? A. Yes.

"(24) Q. Did the plaintiff, before signing the release, ask Zimmerman to read the same to her? A. No.

"(25) Q. What hour in the day on September 4, 1903, did plaintiff sign the release? A. Between two and four P. M.

"(26) Q. Was there sufficient light in the room or hall for the plaintiff to see to read the release? A. Yes.

"(27) Q. Was Zimmerman urging the plaintiff to use haste in the signing of the release? A. No.

"(28) Q. Did the plaintiff have sufficient time to read and consider the release before signing the same, if she wished or desired to do so? A. Yes.

"(29) Q. Did the plaintiff, Ella Coltrane, after taking the voucher known as No. 2 into her possession for signature, ask or request Mr. Zimmerman to read the same to her? A. No.

"(30) Q. Did the plaintiff, Ella Coltrane, reach Albuquerque from California on Friday, the 28th day of August, 1903? A. Yes.

"(31) Q. Did the plaintiff, Ella Coltrane, on the Monday following, attend an institute in Albuquerque, riding to and from said institute on her bicycle? A. Yes.

"(32) Q. Did said institute continue in session for about one week? A. Yes.

"(33) Q. Did said plaintiff continue each day to ride to said institute and return therefrom on her bicycle? A. Yes.

"(34) Q. Did the plaintiff, Ella Coltrane, on the Monday following the close of the institute, commence teaching a regular term of the eighth grade at Albuquerque? A. Yes.

"(35) Q. Did said term of school continue until about the middle of June, 1904? A. Between the 1st and 15th of June.

"(36) Q. Did said plaintiff, Ella Coltrane, during the time she was teaching said term of school ride to and from said school on her bicycle? A. Yes, the most of the time.

"(37) Q. Did the plaintiff, Ella Coltrane, have the vouchers known as 'Exhibits 2 and 4' in her hands for two or three minutes after Mr. Zimmerman had handed the same to her on September 4? A. Yes.

"(38) Q. Did the plaintiff, when the settlement vouchers were handed to her by Zimmerman on September 4, 1903, make mention of the fact to him that the word 'claims' was contained in the voucher, and at the same time state to Zimmerman that she made no claim against the railway company? A. Yes."

Thereupon the defendant filed its motion for judgment upon the findings. The motion was denied and judgment rendered in favor of the plaintiff for the amount of the verdict and costs.

*William R. Smith, O. J. Wood,* and *Alfred A. Scott,* for the plaintiff in error.

*S. D. Bishop,* and *A. C. Mitchell,* for the defendant in error.

The opinion of the court was delivered by

PORTER, J.: The case comes here upon a transcript showing the pleadings, instructions, verdict, special findings, judgment and ruling on the motion for judgment on the special findings, without the evidence; and the single question to be determined is whether on the findings the defendant is entitled to a judgment in its favor. The findings show a case in many respects remarkable. The plaintiff claims to have received permanent injuries of a very serious nature, which have

affected her brain and nervous system, impaired her memory, and disordered and crippled her for life, rendering her unable to follow her usual occupation as a teacher. Her action was not begun until a few days before the statute of limitations had run against the claim. It is shown by the findings that the plaintiff is a woman of education, a graduate of the Kansas University, and that she was engaged for a number of years in teaching school; that after the accident and before she signed the release she was pursuing her usual vocation as a teacher, in regular attendance at a teachers' institute, riding to and from her home on a bicycle. It is apparent that the release was not obtained when she was suffering pain or in distress by reason of her injuries and therefore in a condition to be easily duped into signing away her rights. The findings are that she wrote on each of the vouchers in her own handwriting, "I have read the above voucher and fully understand the same"; that by the exercise of ordinary care she could have informed herself of the contents of the papers; that as a part of the same transaction she indorsed the check given to her by writing her name on the back thereof before it was paid; that she was able to read the release; that her eyesight was good at the time, and she was in possession of her faculties; that she had an opportunity to read it before she signed it if she wished or desired to do so; that there was sufficient light in the room for her to see and read it, and that the agent was not urging her to use haste in signing. The release plainly states that it is in settlement of all claims or causes of action and demands whatsoever against the defendant growing out of injuries sustained by her while a passenger and caused by the rough handling of a train at Williams, Ariz. The claim is described as that of Ella D. Coltrane against the Atchison, Topeka & Santa Fe Railway Company. The receipt is the acknowledgment of the payment of the money by the company in settlement for injuries, and

there is nowhere in it a word to indicate that it is in payment of Pullman fare.

There are two findings of the jury (Nos. 20 and 21) which say she was prevented from reading the release by the statements of Mr. Zimmerman, but none of the findings discloses what those statements were. In the absence of any testimony we can only construe these findings by the averments of the reply, which are to the effect that he stated that the paper or receipt was merely a voucher showing that plaintiff had received back her Pullman fare. The jury, however, in answer to question No. 8, found that when he delivered to her the draft or check for $10.50 he made no statement that the same was given in payment of her Pullman fare. We are asked by the plaintiff to construe this finding to mean merely that the agent made no such statement at the exact instant when he handed her the draft, and to hold that the jury intended so to limit their answer; and it is argued that the general verdict carries with it a presumption that the jury further found the fact to be that at some other time during the transaction he said to her that the draft was intended to pay the amount of her Pullman fare. Obviously the jury could not have intended to draw such hair-splitting distinctions and separate the occurrence of matters which all took place during the three or four minutes occupied by the transaction. The language of the reply itself is that "at said time, with intent to deceive," etc., he "stated, represented and pretended that the said paper, or receipt, was merely a voucher," etc. The reply further states that she signed the draft "as a part of the same transaction."

A written contract can always be explained or impeached by parol testimony, and should not be permitted to stand, where it is shown to have been obtained by fraud. (*Shook v. Manufacturing Co.,* 75 Kan. 301; *Disney v. Jewelry Co.,* 76 Kan. 145; *Railway Co. v. Peck,* 79 Kan. 413.) But courts will not, upon

conflicting or uncertain evidence of fraud or mistake, lightly disturb agreements made in settlement of claims of this nature. In our opinion a release executed by an intelligent, educated person, under all the circumstances disclosed by the findings, should require a substantial finding of some fact showing fraud or undue advantage before it should be set aside.

In *Deming v. Wallace,* 73 Kan. 291, it was charged that the fraud consisted in inducing Wallace to sign notes and a mortgage. The evidence showed that the agents of the investment company urged him to be quick about signing, and that he was not given time to read the papers. There were other circumstances in that case which excused his failure to read and know the contents of the papers signed and which are wholly absent from the case at bar.

In the case of *Jewelry Co. v. Bennett,* 75 Kan. 743, it appeared that Bennett's eyesight was so defective that he was not able to read writing, and there were circumstances there which in the opinion of the court justified his relying upon the statements of the agent as to the contents of the papers.

In *Chicago & N. W. Ry. Co. v. Wilcox,* 116 Fed. 913, where it was sought to set aside a written agreement of settlement and release, it was said:

"The burden is always upon the assailant of the contract to establish the vice which he alleges induced it, and a bare preponderance of evidence will not sustain the burden. A written agreement of settlement and release may not be rescinded for fraud or mistake, unless the evidence of the fraud or mistake is clear, unequivocal, and convincing." (Page 914.)

No fact was found by the jury indicating that any confidential relation existed between the agent and the plaintiff which justified her in relying upon his statements as to what the contents of the paper were. According to her own theory she knew when she signed the paper that it was contractual and in settlement of some kind of a claim or that it was a receipt of some

nature.   Where the relations between the parties are contractual, and not confidential, it is generally the duty of the party to whom the statement is made to ascertain the truth, if he has available means of knowing the truth by the exercise of ordinary prudence and intelligence.   The jury said, in substance, that the plaintiff had available means of ascertaining the truth by the exercise of ordinary prudence.   She had every opportunity to read the paper before signing it, and it was her duty to do so; she wrote an express statement above her signature to the effect that she had read it, and in our opinion she ought to be bound by its terms, unless some fact is shown or found clearly indicating that her signature to it was obtained by fraud or mistake.

It follows that the judgment must be reversed and the cause remanded, with directions to enter judgment in favor of the defendant.