No. 32,441

THE McKNAB-BESS OIL COMPANY, *Appellant,* v. THE COMMONWEALTH OIL & GAS COMPANY, *Appellee.*

(52 P. 2d 363)

740

W. N. Banks, O. L. O'Brien, Walter L. McVey, all of Independence, L. A. Rowland and James D. Talbott, both of Bartlesville, Okla., for the appellant.

T. J. Flannelly, T. J. Hanlon, both of Independence, and Paul B. Mason, of Tulsa, Okla., for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for an accounting and to recover money. Judgment was for defendant, sustaining a demurrer to plaintiff's petition.

The parties to the action were two oil companies. Their differences grew out of an enterprise in which they jointly engaged in the development of some oil leases.

As far as we are concerned here, this relationship began on August 23, 1928. On that date a contract was entered into by the parties with reference to what is known as the A. W. Graham lease. This lease was owned by the Prairie Oil & Gas Company. This company later became the Commonwealth Oil & Gas Company. Under the terms of the contract, in consideration for certain drilling, the McKnab-Bess Oil Company became the owner of a one-half interest in this lease. In this contract the Prairie Oil and Gas Company was designated second party and the McKnab-Bess Oil & Drilling Company first party. It provided, among other things, as follows:

"1. The second party agrees at its own cost and expense to furnish and erect a suitable rig at a location approximately 990 feet from the west line and 350 feet from the south line of the above described tract, and to furnish and deliver at said location all necessary casing and dig a suitable slush pit.

"2. The first party within ten (10) days after the completion of the rig at the location aforesaid, agrees to commence the drilling of a well and to complete said well with due diligence at its own cost and expense to a depth of approximately thirty-three hundred (3,300) feet, or to what is known as the Wilcox sand, unless oil and/or gas in paying quantities is found at a lesser depth.

"3. Should oil and/or gas in paying quantities be found therein, the second party shall take over the operation of said well, and the further cost of shooting, tubing and equipping said well, and the operation of the same, together

with six percent (6%) additional to cover overhead expense, shall be proportionately borne and paid by the parties hereto in accordance with their interests as hereinbefore set forth; that is to say, first party one half (½) and second party one half (½).

"Should said well produce oil and/or gas in paying quantities, said first party shall thereupon become the owner of an undivided one half (½) interest in and to the rig, and in the casing left in the hole, and said first party shall pay for one half (½) of the cost of said rig and casing. . . .

"4. The second party may, if it so elects, after the completion of well aforesaid, drill a second and subsequent well upon said described lands, at locations it may select thereon, and shall have the sole management and control of the operation and development of the lands hereinabove described, and may proceed with the development and operation thereof upon its own initiative. Second party shall furnish all material, equipment and labor at actual cost to it that may be used in the drilling and operation of the property and in caring for, storing and marketing the oil, gas or casinghead gas produced therefrom, with the exception that any second-hand material shall be charged at its fair market value; and, such expense, together with all sums paid out for rentals, taxes, insurance and other items properly chargeable against the land hereinabove described (except the cost and expense of drilling and casing said first well as hereinbefore provided) shall be charged to the account of and paid by the parties to this contract in proportion to their respective interests, as aforesaid, and there shall be added to such account and proportionately borne and paid by the parties hereto six percent (6%) of such cost to cover overhead expense."

It will be noted that the second party was entitled to charge six percent to cover overhead expenses of shooting, tubing and equipping the well should oil or gas in paying quantities be found. There is a difference of opinion between the parties as to the proper construction that should be placed on the clause "except the cost and expense of drilling and casing said first well as hereinbefore provided" as it appears in the above paragraph.

It is provided in the contract as follows:

"6. The second party shall render a statement of account to the first party as soon as practicable after the close of each month, showing all obligations and charges contracted, incurred or expended in connection with the operation and development of said lease as to the above-described land during the preceding month, which statement will show the amount due from the first party to the second party and shall be mailed to the first party at its post-office address, and the first party shall pay and hereby agrees to pay to second party the amount for which said statement is rendered within ten (10) days from the receipt thereof, and if said statement is not paid within said period of ten (10) days, the same shall draw interest at the rate of six percent (6%) per annum from the date thereof."

It also provided—

"The second party shall also render an account to the first party as soon as practicable after the close of each month, showing the amount of oil, gas or casinghead gas produced and sold from the above-described land and the proceeds thereof during the preceding month, and shall pay to the first party its proportionate interest therein; provided, that second party shall have the right, pending payment by first party of accounts hereunder, to withhold all or any part of the first party's share of the proceeds from the sale of oil, gas or casinghead gas produced from the above-described land as payment, or part payment of its share of the expenditures incurred hereunder."

The contract also provided:

"It is further agreed that the second party shall have and it is hereby given and granted a lien upon the interest of the first party in the land above described, and the oil, gas or casinghead gas produced therefrom, and the proceeds thereof, to secure the payment to it of any sums due from the first party for the development and operation of said land above described; and, the first party shall also be personally liable to the second party for all sums due under the terms and conditions of this contract."

It will be noted that paragraph 6 provided that the second party should render a statement of account to the first party showing all obligations and showing the amount due from the first party to the second party and the first party agreed to pay within ten days from the receipt thereof. The paragraph also provided that the second party should render an account each month showing the proceeds received from products taken from the lease and shall pay the first party its interest therein, but may withhold payment until it is paid for the expenditures. The paragraph also gave second party a lien on all proceeds of the lease to secure the payment of any sums due it.

On March 5, 1929, the parties entered into a contract covering the Mitschler and Catlett leases. On June 7, 1929, they entered into a contract covering the Charles W. Roberts leases. An additional cause of action is based on the development of the John Zeien lease. No contract is pleaded.

The contracts with reference to the other leases were substantially the same, and the transactions with reference to the John Zeien lease were substantially the same as those pleaded in both other leases.

It will be seen that the contractual relationship between the parties began on August 23, 1928. It continued through 1928, 1929, 1930 and up to November 18, 1931. The relationship terminated on that date, when a contract was entered into by the parties. That contract was as follows:

"This agreement, made and entered into this 18th day of November, 1931, by and between the Prairie Oil & Gas Company, a corporation, of Independence, Kan., first party, and the McKnab-Bess Oil Company, a corporation, of Winfield, Kan., second party, witnesseth:

"That whereas, the first party and the second party are joint owners of the following oil and gas leases in Cowley county, Kansas, and have been conducting joint operation on all of said leases except the Loren A. Brooks lease, to wit:

". . . and the said first and second parties being each the owners of an undivided one-half interest in and to each of the above-described leases, and,

"Whereas, in the joint operation of said leases, the said the Prairie Oil & Gas Company have operated said leases (except the Brooks lease) under a written operating agreement and paid the costs and expenses incident thereto, and the second party has become indebted to the first party for such costs and expenses in the approximate sum of $26,500, and it is the desire of both parties to liquidate said joint ownership of said leases and the operations thereunder and the claims of each party hereto against the other.

"Now, therefore, in consideration of the benefits moving from each party to the other herein and of the covenants herein contained, and the further sum of one dollar ($1), receipt of which is hereby acknowledged, the second party does hereby agree and does on this date assign and transfer to the first party all its right, title and interest in and to the said above-described leases, proper and valid assignments being this day delivered, and the first party in consideration thereof does hereby acknowledge payment in full of all accounts and claims against said second party growing out of or connected with the said leases or the operation thereof, and does hereby assume payment of any accounts connected with or growing out of the drilling and/or operation of said wells, and each of the parties hereto hereby discharges and releases the other party from any claims growing out of said joint ownership and operation of such leases; provided, that this release, discharge and acquittance shall not apply to, include or cover, nor does the first party assume the payment of, any claims, demands, actions or causes of action arising or growing out of any loss of or damage to property or injury to or death of persons heretofore or hereafter asserted which may be due in any manner in the operation of said wells and/or leases, prior to this date."

This action was commenced January 2, 1934, by the McKnab-Bess Oil Company, being an action for an accounting and for money against the Prairie Oil & Gas Company. The petition alleged facts about as they have been given here. Copies of all the contracts were attached. In addition the petition alleged that monthly statements of account were furnished by the defendant to the plaintiff and remittances were made thereon; that on or about the 28th day of October defendant presented to plaintiff a statement of account showing that plaintiff was indebted to defendant in the amount of $26,524.68, a copy of which statement was attached

to the petition; that plaintiff paid the defendant the entire balance which defendant claimed to be due and that as a result the defendant collected considerable sums of money that it was not entitled to; that a copy of the contract of November 18, 1931, was attached by order of the court, and that on November 18 all interest of the plaintiff in all of the property was transferred to the defendant.

The petition then alleged that in connection with making the charges against plaintiff in the Roberts lease defendant charged plaintiff with six percent overhead on some expenditures which were actually made on its own account and that on this account defendant obtained $2,441.94 from plaintiff to which it was not entitled, and that notwithstanding the terms of the contract defendant improperly charged against this lease depreciation in the sum of $2,217 upon casing which belonged exclusively to the defendant.

The petition also alleged that certain miscellaneous charges in the amount of $79.79 were made against this lease. The petition contained the followed allegation:

"Plaintiff says that at all times it assumed and believed that the monthly statements made by the defendant were correct and that all charges included therein were fairly and properly made. Its attention was never directed to any irregularities in such statements. None of the aforesaid items were ever brought into question or discussed between the plaintiff and the defendant. It had no knowledge of said improper charges until same were discovered by the plaintiff's auditors about six months prior to the filing of this suit. That a demand has been made upon the defendant for an accounting and the defendant has refused to make any corrections with respect to said erroneous charges."

The petition contained similar allegations as to each lease. The prayer was for an accounting, and for a money judgment.

To this petition the defendant interposed a general demurrer on the ground that the facts stated did not constitute a cause of action and that it shows on its face that it is barred by the statute of limitations. This demurrer was sustained. Hence this appeal.

Plaintiff argues that the accounts rendered by defendant to plaintiff and upon which plaintiff paid money to defendant were not such accounts stated as to set in motion the statute of limitations.

This court considered this question in the case of *Kansas City Title & Trust Co. v. Fourth Nat'l Bank*, 135 Kan. 414, 10 P. 2d 896. In that case this court said:

"We hold that the rendition of a monthly statement to a depositor of the

status of his account is fair notice to him of the amount the bank admits it owes him, and that it owes him no more. This practice of rendering monthly statements is born of the necessities of modern banking. They are made for the mutual protection of the bank and its depositor. Such a monthly statement may justly serve as a notice to set the statue of limitations in motion. Having reached this conclusion, it will require no dissertation to show that the pertinent provision of the statute of limitations is the second clause of section 17 of the civil code (R. S. 60-306)." (p. 425.)

The accounts rendered in the case at bar are analogous to those made by a bank. The contract between the parties required that a statement of account should be made showing all obligations and charges contracted. Each statement contained items which made up the amounts it is claimed were erroneously charged. The plaintiff was charged with a duty to examine the accounts that were rendered each month and call the attention of the defendant to any errors or mistakes occurring in them. The plaintiff argues that some of the charges that were made were based on a wrong construction that was placed on the contracts with reference to the six-percent charge. No reason appears, however, why that wrong construction could not have been discovered as readily when the first statement was made as more than two years after the last one. It will be noted that plaintiff pleaded that at all times it assumed and believed that the monthly statements made by defendant were correct. No reason is pleaded or advanced in the argument as to why plaintiff was entitled to make any such assumption any more than any person who receives an account and pays it. Plaintiff argues that the relationship between the parties was a semifiduciary one, but the fact is, as appears from the petition, every transaction between them was evidenced in writing and they dealt with each other at arm's length at all times. Each monthly account was an invitation to the plaintiff to examine it as to its correctness before paying it. When the auditors of plaintiff did examine the accounts the errors were found that are the basis of this action. Had as critical an examination been made when the first accounts were rendered in 1929 plaintiff would not have been confronted with the defense of the statute of limitations. As it is, we hold that the statute started to run when the first alleged erroneous account was rendered, and the action is barred by R. S. 60-306, paragraph 3. This conclusion is fortified by *Porter v. Price*, 80 Fed. 655; also, *Knox v. Pearson*, 64 Kan. 711, 68 Pac. 613. Plaintiff cites and relies on *Schmoker v. Miller*, 89 Kan. 594, 132 Pac. 158. We fail to

see where plaintiff receives any support from this opinion. The syllabus reads:

"Where, in settlement of extensive business transactions parties have deliberately accounted and in good faith agreed upon a balance intended to be final, the result should be accepted by a court unless for some legally sufficient reason substantial justice requires that the settlement should be opened or set aside." (Syl. ¶ 3.)

This was a case where annual settlements of a farming business had been made for six years. This court held as stated in the above syllabus. It would be hard to state a case on paper where the parties "deliberately accounted" to any greater extent than they have in this case.

Defendant also argues that the contract of November 18, 1931, is a defense to the action in this case. In the first place, plaintiff complains that it was error of the trial court to compel it to attach a copy of this contract to the petition. The original petition contained a reference to the settlement. This being the case, we see nothing wrong about causing the plaintiff to attach a copy of the contract of settlement to the petition. Furthermore, no substantial right of plaintiff was prejudiced by causing it to attach this copy. There is no contention that the contract was not actually entered into. The only question is as to the effect of its provisions. No benefit would have resulted to plaintiff by waiting until defendant had pleaded this contract as a matter of defense.

As to the contract itself, the petition pleaded that following the final monthly statement of account on October 28, 1931, wherein plaintiff was shown to owe defendant a balance of $26,524.68 the contract was entered into.

The petition then pleaded that plaintiff paid this balance, and as a result thereof defendant collected considerable money that was not due it.

Under the terms of the agreement, the plaintiff acknowledged the indebtedness and conveyed its interest in the leases to defendant and defendant acknowledged payment of the indebtedness.

The petition nowhere charges that this agreement was obtained by defendant from plaintiff by fraud or mistake or that there are any errors or omissions in it.

The petition does not contain an allegation which has already been set out in this opinion—that plaintiff at all times assumed and believed that the monthly statements made by defendant were cor-

rect. This paragraph does not make any reference to the settlement made in the contract of November 18. The last statement was made October 28, 1931. The settlement was made on the eighteenth of the following month. No reason appears why plaintiff did not make the audit of the accounts in the time that elapsed before this settlement was made and thereby discover the errors and omissions that it now claims were discovered some two years thereafter.

This contract is covered by the rule announced by this court in the case of *Railway Co. v. Coltrane,* 80 Kan. 317, 102 Pac. 835. In that case this court held:

"Under all the circumstances shown by the findings of fact in this case, held, that the release in writing signed by the plaintiff acknowledging full satisfaction of all claims for personal injuries bars her right to recover, and entitles the defendant to judgment in its favor for costs." (Syl.)

See, also, *Black v. Railway Co.,* 103 Kan. 332, 173 Pac. 1068. There a settlement contract was upheld on account of showing that no fraud in obtaining it had been shown. Here no fraud was pleaded. Giving the petition the most liberal interpretation possible, no allegation of mistake or omission is pleaded that would justify setting aside this contract of settlement. We hold that plaintiff is bound by this contract.

The judgment of the trial court is affirmed.