KOPPANG, Respondent, *v.* SEVIER, Appellant.

(No. 7,734.)

(Submitted December 11, 1937. Decided January 12, 1938.)

[75 Pac. (2d) 790.]

*Messrs. Speer & Hoffman,* for Appellant, submitted an original and a supplemental brief; *Mr. Harvey B. Hoffman* argued the cause orally.

84

86

*Messrs. Foot, Aronson & Foot,* and *Mr. C. J. Dousman,* for Respondent, submitted an original and a reply brief; *Mr. A. T. Aronson* and *Mr. Dousman* argued the cause orally.

88

MR. JUSTICE STEWART, delivered the opinion of the court.

This is an appeal by defendant, H. E. Sevier, from a judgment entered against him in the district court of Flathead county. The case was previously before this court on an appeal by plaintiff from a judgment of dismissal entered on motion for judgment on the pleadings. It was then held that the receipt of compensation from the State Industrial Accident Board did not constitute a bar to the action. (*Koppang* v. *Sevier*, 101 Mont. 234, 53 Pac. (2d) 455.) The case is now here after trial on the merits.

The former opinion substantially detailed the facts as alleged in the complaint; however, since the sufficiency of the evidence is one of the questions now raised, some further discussion thereof will be necessary. The parties will be referred to as they appeared in the trial court.

In his answer defendant admitted the occurrence and the results of a collision between his car and the deceased, Koppang, but denied that it was due to neglect or carelessness on his part. As a separate defense, he alleged contributory negligence on the part of Koppang.

After plaintiff's case was closed, defendant moved for a nonsuit. At the close of all of the evidence he moved for a directed verdict. Both motions were denied. A verdict for plaintiff was returned. Motion for a new trial was made and denied.

Eighteen specifications of error are urged. They may be treated under five general heads: (1) Conduct of counsel; (2)

instructions; (3) admissibility of Exhibit 5; (4) admission of oral testimony; and (5) sufficiency of the evidence. We shall discuss the assignments in that order.

The alleged misconduct occurred in the opening statement ▆ of the case to the jury by plaintiff's attorney. From the pleadings it appeared that Koppang was insured under the Workmen's Compensation Act, Revised Codes 1921, sections 2816 et seq., as amended, and that after his death, plaintiff, his widow, was awarded $5,760 compensation; this fact was set up as a separate defense in the answer as a bar to recovery. It was the ruling on this plea that brought about the previous appeal. At the opening of the trial the following statement was made to the jury by plaintiff's counsel: "After the death of Mr. Koppang, who along with other employees of the state was insured by the Industrial Accident Board the compensation was awarded to Mrs. Koppang by the Industrial Accident Board in the amount of $5,760 payable in installments. Under the law when a suit is brought against one who causes or is responsible for an injury or death and a recovery is had, then one-half of this amount which has been paid by the Industrial Accident Board or other insurer must be paid back and therefore the State Industrial Accident Board is interested in this case because if there is a recovery they will first be entitled to one-half of $5,760."

Thereupon counsel for defendant said: "If the court please, at this time I question the propriety of that statement of counsel and I want to make an objection to it. Plaintiff's counsel then replied: "This has been, I think, thoroughly gone into in previous history of this case and the answer set up the fact of payment by the Workmen's Compensation Board. I think it is very material. I just wanted to say that is the reason Mr. Dousman, attorney for the Industrial Accident Board, is here in the case. I think that is all I intend to say at this time." Defendant's counsel then said: "I want to renew my objection." The court: "Very well, make your objection whatever it is." Defendant's counsel: "We object to the statement of counsel with reference to the compensation and to the fact that part of

this money would go to the State of Montana upon the ground it is not involved in this case and was an improper statement on the part of counsel.'' The court: ''Well, I don't know. What is your desire?'' Defendant's counsel: ''Well, I just want to make the formal objection here. If the court please, I am not arguing it at the present time.''

There was no request that the statement be withdrawn, or that counsel be reprimanded, or that the jury be admonished or discharged. No ruling of the court was invoked. In the light of the record, was error committed? The presumption is that the trial court was correct. In view of the fact that counsel made no request for a ruling even after the court asked him what his desire was, it would be over-technical to disregard that presumption and place the trial court in error—especially so where there is no assignment that the verdict is excessive. (See, generally, 4 C. J. S., Appeal and Error, sec. 297, pp. 590, 592, also sec. 329, p. 680; *State* v. *Biggerstaff*, 17 Mont. 510, 516, 43 Pac. 709.)

The matter of compensation was pleaded in the answer and controverted in the reply. Pleadings are often read to the jury and are sometimes taken to the jury room along with other papers and exhibits. (*Paxton* v. *Woodward*, 31 Mont. 195, 213, 78 Pac. 215, 107 Am. St. Rep. 416, 3 Ann. Cas. 546.) The transcript does not disclose affirmatively whether either of these things occurred, but either was possible. The pleadings did not carry notice of the fact that under the law, in the event of recovery, plaintiff would have to turn back half of the compensation award; on the contrary, they showed only that the award had been made to plaintiff. It was not error to advise the jury that she would only be able to retain half of that amount in case its verdict was for her. In such case it would have been proper, and we think the better practice, for the court, at the request of counsel, or of its own motion, to have instructed the jury on the point, rather than to rely simply on counsel's statement that such was the law. The matter did not come within the purview of the rule forbidding reference to insurance in damage cases generally. (See *Francis*

v. *Heidel*, 104 Mont. 580, 587, 68 Pac. (2d) 583, and cases cited therein.)

Ten of the assigned errors relate to instructions given and ▮▮▮ refused. Instruction No. 23 was given, as follows: "A person lawfully and carefully using a highway has the right to assume that all other persons using the highway will use ordinary care and caution, and that drivers of motor vehicles will obey and abide by the statutory traffic law and regulations. Therefore, the deceased, A. A. Koppang, had the right to presume that the defendant would perform his duty and obey the statutory traffic rules, and he was not required to anticipate that the defendant would not stop his truck when flagged." Defendant excepted on the ground that "it is conflicting and ambiguous in that it states that a person is governed by the statutory traffic laws and regulations in one part of the instruction and then sets up a different rule in the case of a flagman or the duty of a driver of a motor vehicle with reference to the flagman." The exception is without merit.

It is a well-settled rule in this jurisdiction that instructions must be considered as a whole, and that, if they fairly tender the case to the jury, it is not reversible error that one or more of the instructions, standing alone, is not as full or accurate as it might have been. The subject matter of the instruction was touched upon and qualified by at least five other instructions.

Under the terms of section 1788, Revised Codes, it is provided that the State Highway Commission shall formulate necessary rules and regulations for the construction, repair, maintenance, and marking of state highways. It would seem that defendant's exception fails to take into consideration the power of the Highway Commission under this statute to make necessary rules and regulations providing for a flagman. In view of all the instructions given, it cannot be said that instruction 23, by reason of the provisions of the safety card and flagman regulation, presented defendant's conduct to the jury as negligence as a matter of law. The instruction fairly submitted that portion of the case to the jury.

The court refused to give defendant's requested instruction No. 10, reading as follows: "You are instructed that the instructions on the card handed to the defendant and admitted in evidence in this case are not rules of the road which were binding upon the defendant. The instructions upon such card constitute a caution to the driver for his own protection and that he proceeds at his own risk as to himself and property when traveling over a road under construction. In traveling over a highway under construction a driver is bound by the same rules and regulations as upon a highway not under construction; that is to say, he must use such care and caution in operating his motor vehicle in each case as a reasonably careful and prudent person would ordinarily exercise under the circumstances as it [they?] may exist or arise."

Section 1788, supra, gave the Highway Commission power to make and enforce reasonable rules and regulations for the protection of the traveling public on roads under construction, as well as for the protection of the workmen. The duty of the defendant was substantially incorporated in another instruction given by the court.

The court gave instruction 5 over defendant's objection, also ▮ bearing on the subject matter of the instruction just discussed. We quote it and commend it as being a proper and intelligent instruction: "You are instructed that the right of the public to use a highway while roadwork is being done thereon, is subordinate to the right of the public authorities to cause improvements to be made. That from the very nature of such construction work, perils are created against which travelers must be on their guard and which justify the authorities in making reasonable regulations which have for their purpose the protection of the traveling public and those who are engaged in such construction work."

The exception is answered in part by what has been hereinbefore said. The balance of the exception raising the question as to whether the highway was completed in the vicinity of the accident presented a question upon which there was a conflict of evidence in the record. We shall reserve a discussion on this

point until we treat the question of the sufficiency of the evidence.

Defendant's requested instruction No. 18 was as follows: ██ ''You are instructed that even should you find from the evidence that at the time the deceased, A. A. Koppang, received the personal injuries alleged, he was an employee of the State Highway Commission, nevertheless that did not give him the absolute right to require the defendant to stop his motor vehicle at the time and place in question. If you believe from the evidence that the workmen had completed the highway at the place where Mr. Koppang was injured and for any considerable distance above, over which the defendant had traveled immediately before the collision involved, the deceased is chargeable at law with knowledge that he did not have the right to require the defendant to stop his motor vehicle; and if you believe that he came to his injuries, directly and proximately, in a wilful attempt to compel the defendant to stop his motor vehicle, you are instructed that your verdict must be for the defendant.''

Nowhere in the instructions given was it stated that Koppang had an absolute right to stop defendant's truck. On the contrary, instruction 9 mentioned the duty of the deceased flagman to exercise his intelligence to discover and avoid dangers caused by the culpable negligence of another, while instruction No. 20 placed the same duty of care on defendant as was required by the ordinary man where forewarned of construction ahead. The balance of the instruction was covered by others given. The instruction was properly refused.

We have given careful consideration to all instructions given as well as those refused, and are satisfied that those given adequately covered the substance of those refused. The instructions given as a whole fairly tendered the case to the jury on all the issues raised.

Plaintiff's Exhibit 5, admitted in evidence over defendant's ██ objection, was the card handed to defendant by the flagman as he entered upon the oiling project, and is the card mentioned in the instructions just discussed. The card read as follows:

"Please Drive Safely

"To the Driver:

"At your own risk you are being allowed to pass through this oiling work that you may not suffer inconvenience from dusty, rough detours. If You Drive Carefully (Not Over 20 Miles Per Hour), Stopping When Necessary Your Car and Others Will Not be Splashed with Oil, and no danger will result from loose gravel, meeting or passing other cars or working equipment. Equipment has the Right of Way at All Times. Please return this card to flagman at other end.

"Thank you,

"Montana State Highway Commission."

This procedure of handing this card to motorists entering the construction work and collecting it at the opposite end by a flagman stationed there for that purpose was apparently a regulation adopted by the Highway Commission for the well-being and safety of travelers over the construction work as well as for workmen on the project—a time-saving safety measure.

It is common knowledge that points and places of danger, and roads under construction increasing the hazards of travel, are usually marked in some manner by those responsible for the care of the highway and its construction. Here, the precaution was taken to flag cars down and hand the card of instructions to the driver for the protection of all concerned. Section 1788, supra, is broad enough to provide for such regulation or procedure. It did not purport to be anything more than a warning to those who happened to pass over the construction project.

The speed limit specified on the card was more advisory than otherwise. It was simply defendant's duty upon receipt of this warning card, as was specifically set out in the instruction, to use such care as an ordinary man would use after being warned that the road was being repaired, and to return the card to the flagman at the other end. The exhibit was properly admitted in evidence.

96

Assignment No. 15 challenges the admission in evidence of ██ ██ a statement made by deceased shortly after the happening of the accident. Within a very short time after the accident he was moved into the shade of a deserted oil station approximately 200 feet away. The witness whose testimony was challenged testified that he was a laborer on the same project; that he arrived at the oil station and saw deceased lying in the shade just a few minutes after the accident had happened. He was asked this question: "Did you hear him make any statement as to the cause of the accident?" He was allowed to answer, over objection, "All I heard him say was, he was speaking to the boss, he said, he didn't try to miss me."

The record does not show under what theory the court admitted this statement, but the only possible one would seem to be that it was a part of the *res gestae*. In the case of *Sullivan* v. *Metropolitan Life Ins. Co.*, 96 Mont. 254, 267, 29 Pac. (2d) 1046, 1049, we reiterated the well-recognized rule that "the solution of the question of admissibility of the evidence must in every case be left largely to the sound legal discretion of the trial court, subject to review only in case of manifest abuse."

It would seem that the statement was admissible as part of the *res gestae* under the rule announced in the *Sullivan Case*, supra, because it was a declaration made while the mind of the speaker was laboring under the excitement aroused by the accident before there was time to reflect and fabricate; that the statement was narrative in form did not change the rule. (*Sullivan Case*, supra.) The effect of the admission of this statement was minimized by the admission of evidence of other witnesses for both sides to the effect that deceased at about the same time made the following statement, which apparently became the accepted theory of the case: "I was trying to dodge the truck and the truck was trying to dodge me." The court did not abuse its discretion in admitting the statement.

Error is assigned because of the exclusion of the evidence of witness Carr, flagman on the opposite end of the same oiling project, with regard to certain parts of a conversation had with deceased with reference to his flagging sometimes from

the center of the road. Carr had previously testified as to his instructions to flag from the side of the road, but he did not know whether the same instructions were given to other flagmen. Nothing in the evidence showed that it was a uniform rule or regulation. The answer to the question to which objection was made and sustained was fairly apparent from the preliminary questions leading up to it. The rule requiring an offer of proof to be made to preserve the question for review was thereby dispensed with. (See *Trogdon* v. *Hanson Sheep Co.*, 49 Mont. 1, 4, 139 Pac. 792, for rule.) The answer would, however, have been immaterial in view of the fact that no showing had been made as to the uniformity of such method of flagging. In view of instruction 16, calling attention to deceased's method of flagging, it would seem that defendant was not prejudiced by the court's ruling.

The final and most serious assignment of error relates to the sufficiency of the evidence. Before entering upon a discussion of that question, it will be well to understand and have in mind the following established rules: (a) That this court indulges the presumption that a judgment of a trial court is correct and will be upheld unless clearly shown to be erroneous, and that the burden of showing the contrary rests upon the appellant. (*Dalbey* v. *Equitable Life Assur. Soc.*, 105 Mont. 587, 74 Pac. (2d) 432, and cases therein cited; *Autio* v. *Miller*, 92 Mont. 150, 163, 11 Pac. (2d) 1039.) (b) That the solution of any issue may rest in whole or in part upon circumstantial evidence. (*Dalbey Case*, supra; *Doheny* v. *Coverdale*, 104 Mont. 534, 547, 68 Pac. (2d) 142.) (c) That the questions of negligence, contributory negligence, and proximate cause, where the evidence is sufficient to go to the jury, are questions of fact for the jury under proper instructions from the court. (*Chancellor* v. *Hines Motor Supply Co.*, 104 Mont. 603, 611, 612, 69 Pac. (2d) 764; *Baatz* v. *Noble*, 105 Mont. 59, 69 Pac. (2d) 579, 582; *Cowden* v. *Crippen*, 101 Mont. 187, 208, 53 Pac. (2d) 98; *Fulton* v. *Chouteau County Farmers' Co.*, 98 Mont. 48, 37 Pac. (2d) 1025.) (d) That where the record presents a conflict in the evidence, resolved by the jury, that determination must stand

if the evidence, fully considered, furnishes reasonable grounds for different conclusions. (*Dalbey Case*, supra; *Morton* v. *Mooney*, 97 Mont. 1, 11, 33 Pac. (2d) 262.)

The theory of plaintiff's case is that deceased, while in the ▇▇▇ performance of his duties as flagman, was negligently run into by defendant who had such poor control of his heavily loaded truck or was driving it so fast that he was unable to stop or slow down in time to avoid running into deceased; and that defendant's negligence created a condition of emergency and a menace from which deceased could not escape. Defendant contends that his car was under control at all times; that the road was finished at and for a considerable distance above the scene of the accident, causing him to believe that the flagman had been removed; that deceased suddenly loomed up from somewhere a hundred feet or so ahead of defendant's truck in an attempt to flag, and was thereby killed by his own negligence while defendant was making every possible effort to avoid running into him. What does the evidence show?

Defendant, a truckman hauling a 7,500-pound load of potatoes on a new Chevrolet truck, entered the oiling project at its west end at about 2 o'clock P. M. He was stopped by a flagman and handed the warning card and was told to give it to the flagman at the other end. Defendant handed the card to his companion, and it was read by him to the defendant. They both testified that they proceeded slowly through the project—20 to 25 miles per hour; this is in contradiction of the testimony of the driver of the car which followed all the way through and which was first to arrive at the scene of the accident. That testimony was that he was driving 30 to 35 miles per hour all the way through.

Defendant came upon at least one workman on the project, and possibly two, to whom he attempted to give the card but was signaled to go on. He interpreted this to mean that the flagman was still farther down the road. One of these men testified that defendant passed him at 35 or 40 miles an hour and attempted to hand him the card as he went by. This was contradicted by defendant and his companion. After passing the last workman, defendant proceeded, and, according to his testi-

mony, came first upon a roller working, and later upon a road maintainer. After passing these, he testified that the road seemed good and finished, and he and his companion thought that the flagman had been removed. He proceeded over a hill (accident hill) and started down the 6 per cent. grade, around a long, gradual curve. The curve and hill were illustrated at the trial by a plat drawn to scale and photographs and snapshots were introduced by both sides. The purpose of the exhibits was mainly to illustrate the apparent distance of visibility around the hill on this curve. These matters were detailed by the photographer who took the pictures and several other witnesses who assisted with the measurements; also by the division engineer of the State Highway Department who apparently drew the plat. Their testimony varied somewhat, but most of them estimated the distance at between 450 and 500 feet. Defendant himself admitted that the visibility was probably about 300 feet. This visibility necessarily was not in a straight line but was only possible to one looking ahead laterally, that is to say, sidewise as he proceeded down and around the curve.

Defendant and his companion testified that they did not see from whence deceased appeared on the highway, except that he was proceeding from the guard-rail side of the road when first observed. The coroner and others who examined the scene of the accident located the probable point of entry by the presence of bits of glass and blood stains on the highway. A short distance away there was the mark of a block of wood upon which it was assumed the deceased had been sitting. Some of the bits of glass were presumably from dark glasses worn by deceased, and other fragments were possibly from the crystal of his watch or splinters from headlights.

There was some conflict in the evidence as to just how far above the point of the accident construction work was finished. The highway division engineer testified that the finishing—the rolling—was done in mile stretches. He thought the rolling was in progress on the mile stretch on which the accident occurred. He said, ''Ordinarily if the rolling of this last mile had been completed the flagman would have been moved up

to the next mile.'' He was corroborated in this by a workman who testified that he was within half to three-quarters of a mile from where the accident occurred, and that the roller was working between deceased and himself. Further corroborative testimony was given on this point by the coroner, the deputy sheriff, and the ambulance driver who was called to the scene of the accident. The defendant's companion also testified as to the unfinished condition of the highway within less than a mile of the scene of the accident, and in fact near the top of accident hill—a distance of less than a quarter of a mile. Another of plaintiff's witnesses testified the road was in driving condition for half a mile before the point at which deceased was stationed. This statement was corroborated by others, including the occupants of the car which followed defendant over the oiling project. One of the latter witnesses described the road as ''a perfect road.''

The only eye-witnesses to the accident were defendant, his companion, and deceased. We have, therefore, in so far as direct evidence on the question of the proximate cause of the accident is concerned, the testimony of defendant and his companion, as against the physical facts and circumstances surrounding the accident.

Defendant testified that he came down the hill at not over 25 miles per hour; that he looked ahead prior to the time deceased appeared in the road but saw no obstruction of any kind; that the deceased flagman came suddenly into the center of the road on a ''kind of a trot''; that he immediately began to put all the power he had on the brakes and made an effort to go around the man. This was his testimony: ''I undertook to pass the man when he came to the center of the road. I undertook to pass him on the right hand side because that was my side of the road, and I had plenty of room but he didn't stay in the center of the road, and as he stepped in my line of travel I swung my truck back to go around him on that side and the man didn't stay there. He came back in front of me again and as I tried to avoid him at that point I struck the man.'' He testified further that he was going about 8 or 10 miles per

hour when he struck the deceased, but the evidence shows that he did not stop his truck for a distance of approximately 225 feet after the impact. Defendant explained this on the theory that he was shocked and might have let up on his brake after striking the man. Defendant's companion jumped from the truck and ran back to the injured man, and, when defendant had brought his truck to a stop and set his brake, he ran back and joined them. The emergency brake apparently was not used by defendant in his attempt to stop before striking deceased.

On cross-examination defendant testified that this was his first experience where a warning card was used; that he was looking for a flagman to take the card up at the other end of the work; that he attempted to give the card to a man on the highway but was motioned on; that when he saw deceased in the roadway with a flag he knew he was the flagman; that when he saw him he did not realize that he would not be able to stop his truck but naturally thought he could do so before he got to him; that defendant and deceased kept going from side to side, each apparently thinking he would dodge the other by so doing; that he did not sound his horn because there was no occasion to do so; and that at first deceased looked like he was determined that defendant must stop that truck in front of him. Defendant was substantially corroborated in every particular by his companion.

There was some testimony about zigzag marks in the road above the position where the flagman was apparently attempting to flag the truck. One of the witnesses placed the marks as being back from the place of the accident about 50 to 75 feet. Defendant testified that from the time he first saw deceased and began zigzagging across the road there was ample time for deceased to reach a place of safety at the side of the road; that, when defendant first turned to the right and deceased stepped in front of him, he was not over two steps from the gravel portion of the road (apparently the shoulder). He then said that, when deceased crossed to the left side of the road in front of

the approaching truck, he was likewise not over two or three steps from the left shoulder of the road.

This is but a brief résumé of the voluminous transcript of testimony bearing on the question of negligence and proximate cause.

Deceased was not a pedestrian upon the highway, but was there in the performance of his duties as flagman, under which circumstances he was not to be considered in the same light, nor to be bound by the same rules, as those governing a pedestrian. (See *Mecham* v. *Crump*, 137 Cal. App. 200, 204, 30 Pac. (2d) 568.) He had the right to assume that defendant would not run him down without warning while he was engaged in the performance of his duties as flagman, and particularly so in view of the flagging system in use and the actual notice given by the warning card.

The court in instruction 22 gave in substance the law as approved by this court, to the effect that: ''A person is presumed to see that which he could see by looking, and he will not be permitted to say he did not see or know what he must have seen or known had he looked.'' (See *Autio* v. *Miller,* supra; *Boepple* v. *Mohalt,* 101 Mont. 417, 435, 54 Pac. (2d) 857.) Defendant had not yet redelivered the safety card at the terminus of the project, and, by his own testimony, expected to come upon such a flagman. He had tried to give the card to one who was not the flagman and was told, ''I am not the guy.'' He passed a roller at work, and after that a road maintainer. He must have known that he was still in the construction zone. After passing the roller, the road may have been smoother than before, yet the evidence fairly discloses that it was not a finished project.

Defendant was charged with the knowledge that he was traveling in a restricted zone, and had no right to assume that the flagman had been removed. He came down a curved hill in high gear, and, according to his own testimony at the coroner's inquest, was traveling at a speed of 25 or 30 miles per hour when he first dropped over the hill; at the trial he said not over 25 miles an hour. Another portion of his testimony given

at the inquest was, "As I rounded the curve I threw it into high as fast as I could. I wasn't looking at the road. I was looking right [down?] my radiator watching the road as the road unfolded to me." He said he meant by this, "I wasn't looking around over the country. I was looking right down over my radiator, watching the road as it unfolded in my vision." According to his own testimony, he had a clear vision of 300 feet as he proceeded around this curve. The testimony of the driver of the car following corroborated him on this point. Others testified that the vision was clear for a greater distance. If he were proceeding at 25 miles per hour down the 6 per cent. grade and had looked laterally ahead, as he was bound to do (*Boepple* v. *Mohalt,* supra), he could have seen the flagman at his station, if the flagman actually were present. This was a fact for the jury, and there was circumstantial evidence that he was present.

Defendant's theory is that he looked down the road prior to the accident and saw no obstruction, and that the flagman suddenly loomed up before him from somewhere unknown to defendant or his companion. Did the jury believe that he looked as he said he did, or did it believe that he continued to look right down over his radiator, watching the road as it unfolded in his vision, as he also said he did? Did it believe that he came down the grade cautiously at 25 miles per hour, or did it believe that he broke over the crest of the hill at 25 or 30 miles per hour in high, and continued to accelerate down the grade until such time as he noticed the flagman in the road? If he proceeded from 30 to 35 miles per hour across the oiling project, as the driver of the car that followed him said they were traveling, and if he passed a workman at 35 to 40 miles per hour, was it logical or probable that he would be traveling at a lesser rate of speed when reaching what he thought was a finished road? The jury apparently believed not. There is evidence both ways on the question, and the jury resolved it against defendant. We are precluded from disturbing its conclusion.

As to the evidence with respect to defendant's attempt to avoid striking the flagman after he saw him, it was for the jury to believe him or repudiate his contention in favor of some other theory borne out by the evidence, including the circumstances and physical possibilities. The jury must have found that defendant did not see that which he could have seen had he looked, or else, if he did see, that he did not have his car in such control as would enable him to stop or avoid injury to the flagman.

That deceased flagged from the center of the road would seem to be immaterial. The division engineer testified that he did not consider such practice as dangerous, and deceased by virtue of his previous three weeks of service in the capacity of flagman must have found that flagging from the center of the road was safe and effective. In the absence of a showing that it was the uniform practice and rule for flagmen to always flag from the side of the road, it would seem immaterial that the flagman at the other end of the project flagged from the side.

Deceased had every reason to believe that all cars would stop when flagged, and particularly those coming off the construction with a card of warning to be delivered to a flagman whose presence at the end of the project had been advertised in advance. Deceased's conduct would seem to come within the rule announced in 45 C. J. section 516 (3), page 962, which declares as follows: "In order that one may be guilty of contributory negligence in selecting the hazardous course, it must appear that he knew and appreciated, or in the exercise of ordinary care should have known and appreciated that the course chosen was not unlikely to result in his injury." (See, also, 45 C. J. sec. 515 (2), p. 961.) It was for the jury to say, from the evidence, whether defendant's conduct constituted negligence, and whether deceased was free from contributory negligence. Likewise, the question of proximate cause was for it to decide.

We cannot say that the verdict was without supporting evidence or against the law, particularly in view of the law with

relation to emergencies which was fully covered in the instructions. (45 C. J. sec. 517 (4), p. 962; *Autio* v. *Miller*, supra.)

The judgment is affirmed.

Mr. Chief Justice Sands and Associate Justices Anderson, Morris and Angstman concur.