JENSEN, Respondent, *v.* CLOUD, Appellant.

(No. 7,857.)

(Submitted January 27, 1939.   Decided February 21, 1939.)

[88 Pac. (2d) 36.].

*Messrs. Freeman, Thelen & Freeman,* for Appellant, submitted a brief; *Mr. J. P. Freeman* argued the cause orally.

*Messrs. Swanberg & Swanberg,* for Respondent, submitted a brief; *Mr. Randolph Swanberg* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal from a judgment for respondent, plaintiff below, in an action brought to recover wages for hauling petroleum products for appellant, defendant below.

The complaint contains two causes of action, the first based on an alleged oral promise of defendant to pay plaintiff $5 per round trip for driving a truck between Laurel, Montana,

and Cody, Wyoming. The second is based on an alleged oral promise to pay plaintiff the regular and customary wages paid to drivers of gasoline trucks, alleged to be three and one-quarter cents per mile, for operating a gasoline truck in the vicinity of Great Falls. Motion for nonsuit was made and denied, and after hearing all of the evidence the jury returned its verdict for plaintiff in the sum of $369.60 and costs. Motion for new trial was not acted upon by the court and, therefore, was deemed denied. This appeal resulted.

The gist of the first cause of action is that defendant, in violation of his agreement to pay $5 per round trip, only paid $4. One hundred and sixty-two trips having been made, it is plaintiff's contention that he is entitled to the $1 additional for each trip, amounting to $162. The breach relied upon in the second cause of action is that defendant only paid two cents per mile for 16,480 miles traveled, whereas the agreement was that defendant would pay the going wage for hauling gasoline, which plaintiff contends was three and one-quarter cents per mile during the period of employment.

The specifications of error assigned present but one question: Is the evidence sufficient to justify the judgment? Respondent urges as a cross-assignment of error that the court erred in settling the bill of exceptions over his objection that it was not filed in time. We shall dispose of the cross-assignment first.

Defendant was granted 45 days in addition to the time allowed by law in which to prepare, serve and file his bill of exceptions. Subsequently the court reporter, who had taken the testimony in the cause, filed an affidavit setting forth the necessity for an additional 60 days in which to complete the bill of exceptions. The affidavit stated in part: "That your affiant * * * has been engaged in the taking of testimony in the State Oil Proration hearing and also in other cases. * * * That with the amount of work * * * on hand to complete, it will take at lease sixty (60) days in which to complete the transcript." The district judge considered this as good cause and granted the extension of time.

Counsel for plaintiff argue that in view of section 8934, Revised Codes, the facts set forth in the affidavit fail to disclose the necessity required to move the court's discretion. We cannot agree. Section 8934 provides for a court stenographer *pro tempore* when the regular stenographer has been excused for good and sufficient reason by order of the court. This section provides in part: "Employment in his professional capacity elsewhere is not a good and sufficient reason for such excuse." It is plaintiff's theory that the work in connection with the oil proration hearings was private employment, and therefore not a good and sufficient excuse for a further extension of time. The force of this contention is dissipated by the fact that the affidavit showed that the reporter, while engaged in some private employment elsewhere, also had work on "other cases" in which he was engaged, all of which he asserted made the extension necessary. The showing was sufficient to appeal to the court's discretion under section 9390, Revised Codes. (Compare *Costello* v. *Shields,* 99 Mont. 335, 43 Pac. (2d) 879, and cases therein cited.)

No review of the evidence would be proper without first adverting to the general rule which has been announced and repeated so often by this court that reference to authorities on the subject has become simply a matter of formality. That rule is that the verdict of a jury will not be disturbed on appeal unless the evidence is so improbable or inherently weak that it can be said that there is no substantial evidence to support the verdict. Variations of this rule have been summarized in *Wallace* v. *Wallace,* 85 Mont. 492, 279 Pac. 374, 66 A. L. R. 587 and *Koppang* v. *Sevier,* 106 Mont. 79, 75 Pac. (2d) 790.

The evidence as to the first cause of action shows that plaintiff entered the employ of defendant in November, 1934, and hauled crude oil between Laurel and Cody, and on some occasions hauled road oil to various points. For this work defendant paid him $3 per round trip. There is no controversy with regard to the wages paid on road oil trips. At the time he commenced working he testified that in a conversation had with defendant, the latter promised to pay him $5 per round trip

around Christmas time when trailers would be used. Defendant issued statements from time to time to plaintiff and the other truck drivers, showing the status of the labor account between employer and employee. Plaintiff was able to ascertain from his first statement that he was not getting $5 a round trip with trailer as promised, but was only receiving $4.

It appearing that there was dissatisfaction and lack of harmony among the drivers, a general meeting of all the drivers was held in February, 1935, to talk matters over, and at which time the subject of wages was discussed. Plaintiff testified that at that time defendant told the drivers, "I know I promised you boys five dollars a trip hauling the trailers, but on account of the bridge being out I cannot pay it." He testified further that defendant urged the drivers to try and go along with him to help him out, and that he would make up the difference later around income tax time. Two others testifying in behalf of plaintiff corroborated him on the proposition that they were led by defendant to believe that they were to get $5 for each round trip with trailers, and on the further point that, not having received that amount, the difference would be made up to them eventually.

On cross-examination one of these witnesses testified as follows: "We were led to believe for certain it was five dollars at that time. That was before he got the trailers. * * * He made the statement he was thinking about getting them, and as to whether he thought he could raise our pay to five dollars, it was not that way exactly. The way it was put to us was we were going to get it; there was no think about it * * * He told us he couldn't pay us five dollars right then but he would make it up to us. He said he would make it up to us through a bonus, but he never paid a bonus that I know of."

To counteract this testimony defendant took the stand in his own behalf. He admitted having stated that he intended to pay his drivers $5 per trip when trailers were put in, but due to unforeseen circumstances he was unable to go through with his plans. His testimony and that of his corroborating witnesses was to the effect that the $5 rate had never reached more than

the realm of hope on his part that he would be able to pay his drivers that amount. Such plan never materialized for various reasons. The bridge across the Yellowstone River went out, causing defendant to transfer loads across a temporary bridge structure under a reduced load limit, thereby increasing his overhead. The ton-mile tax on petroleum in effect in Wyoming in 1935 did likewise. He testified also that the trailers cost more than he had expected, and that these circumstances, under his understanding of the alleged promise to pay $5 a trip, all contributed to the determination on his part, even before the trailers went into operation, that he could not pay the drivers the $5 that he had hoped.

It will be seen from these brief excerpts from the evidence that the jury was confronted with two conflicting versions of the alleged $5 promise. Was defendant's promise to pay an out and out promise, or was it merely a plan which never materialized and which became indefinitely postponed pending a change in business circumstances? The jury resolved the matter in favor of plaintiff. It is obvious that it had some evidence, although conflicting in nature, upon which to base that conclusion. Either story was plausible and possible, and in such circumstances it is not our province or duty to interfere with such determination.

The contention is made by defendant that by virtue of the ██ statements rendered from time to time, plaintiff knew the status of his account with defendant and the amount of wages he was earning. He claims that this, coupled with the fact that plaintiff accepted checks for his labor which on the face thereof purported to be in full payment of his labor account, preclude him from successfully asserting that additional wages are due.

It appears that it was defendant's practice to pay his drivers weekly even though their accounts did not always show balances due them. Defendant argues that having on various occasions balanced the account with plaintiff, final settlement to date occurred when the latter received and cashed defendant's checks. Plaintiff refused the last check offered by defendant on the

ground that it was not for the correct amount in full settlement.

In *Harrington* v. *Deloraine Refining Co.*, 99 Mont. 78, 87, 43 Pac. (2d) 660, we announced the rule that, "In construing a receipt, the paper must be viewed in its entirety and with due regard to the conditions surrounding its execution. A receipt in full for a particular demand is not conclusive evidence of a general settlement of accounts between the parties. (48 C. J. 634.) The question whether the check here considered was in full settlement of all demands due plaintiff from defendant was properly submitted to the jury. (*Everhardy* v. *Union Finance Co.*, 115 Cal. App. 460, 1 Pac. (2d) 1024.)" The rule has application here.

Defendant's theory is that the amount of wages being in dispute, an unliquidated claim existed and the acceptance by plaintiff of a lesser amount than that claimed to be due constituted an accord and satisfaction. (*Sawyer* v. *Somers Lumber Co.*, 86 Mont. 169, 179, 282 Pac. 852.) It was said in that case: "By the great weight of authority, if the indebtedness is unliquidated or in dispute, payment by the debtor of an amount less than claimed by the creditor, and the receipt by the latter of such amount under such circumstances that he is bound to know that the intention was to make the payment in full settlement of the claim, will discharge the whole claim, and the creditor may not thereafter maintain an action to collect additional sums. Under these circumstances there is an agreement to compromise the difference between the parties, and, there being a dispute, a consideration for the agreement exists." From this it is apparent that in order that a claim be an unliquidated one, there must be a bona fide dispute between the parties with respect to the amount due. This question was one of fact for the jury to determine. (*Harrington* v. *Deloraine Refining Co.*, supra; *Sawyer* v. *Somers Lumber Co.*, supra.) If it believed that plaintiff was working at a wage less than he claimed to be due, under the apprehension that defendant would eventually make it up by a bonus or otherwise, it could not then logically find that plaintiff accepted the lesser amounts under such circumstances that he was bound to know that it was defendant's intention

to make payment in full settlement of plaintiff's claim to a date certain. In other words, under plaintiff's version of the agreement, no bona fide dispute actually existed between the parties, and plaintiff continued to work until he learned that defendant did not intend to pay him any amount other than that shown by the statements.

In so far as the second cause of action is concerned, the evidence shows substantially that plaintiff was transferred from Laurel to Great Falls in November, 1935; that he hauled crude oil for a few months and was then put on a gasoline truck with the idea in mind that he could increase his earnings. Defendant testified that he thought plaintiff could earn more money hauling gasoline. Plaintiff testified that he "worked steadier and made more money, but did not make as much per mile." It is uncontradicted that plaintiff was promised that he would be paid the regular and customary going wage for hauling gasoline. He testified that he knew the going wage was three and one-quarter cents per mile. The record discloses, however, that he was paid the same rate for such work as the rest of defendant's drivers, namely, three cents per mile under, and two cents per mile over fifty miles. Defendant was corroborated in his statement of this arrangement by his manager and other witnesses.

It appears that when plaintiff first commenced driving the gasoline truck the wage he was to get had not exactly been determined other than that he was to get the going wage. Plaintiff attempted to prove that the going wage was three and one-quarter cents per mile for gasoline trucking, by showing that the Great Northern Freight Company paid that rate for "similar" hauling, but he also testified that he did not know what that company was paying for hauling gasoline freight. In addition, plaintiff testified that three and one-quarter cents per mile was the scale set for that type of trucking by the Teamsters' Union. No proof was offered, however, that any truckers of that union were ever paid that rate for trucking gasoline.

It is defendant's contention that the going wage he intended to pay was one which he himself would have to establish, after

he had operated a while, on the basis of railroad rates. He had not regularly been engaged in trucking gasoline, and apparently no one else was in that business in Great Falls. At the time plaintiff was shifted to a gasoline truck, defendant had just commenced to haul the entire output for the Home Oil and Refining Company. There was no customary wage in existence in Great Falls for trucking gasoline at the time plaintiff started to haul.

In order for plaintiff to recover on the basis of the three and one-quarter cents per mile rate, it was incumbent upon him to prove that that was the customary going wage for hauling gasoline, as that is what he alleged in his complaint. As above pointed out, the nearest he came to proving that such was the rate, was by reference to what the Great Northern paid for freight hauling, and what the Great Falls Teamsters' Union had set up as the scale for that type of trucking. Proof of either of these comparisons would have been sufficient to establish the going rate, or at least would have given the jury something upon which to base its verdict; but no evidence was produced to show that the teamsters' scale was in effect with respect to gasoline trucking, or that any of its members were engaged in that type of hauling at the union scale of three and one-quarter cents per mile; nor was any proof offered to show that that rate was paid by the Great Northern Company for hauling gasoline. In fact, the record does not even show that the latter company was engaged in the trucking of gasoline.

Plaintiff contends that the rate paid for freight hauling is of sufficient similarity to serve as a criterion for determining the going wage for hauling gasoline. This does not necessarily or logically follow. It takes no lengthy argument to illustrate that there is a vast difference between general freight hauling and the trucking of gasoline. The latter is a comparatively easy job from a manual labor standpoint as compared with the handling and hauling of general freight. The record undisputedly shows that the work involved in loading and unloading a gasoline truck amounts to little more than transferring a hose from truck to tank and securing the coupling thereto. Pumps

or gravity do the work while the driver stands by, and the driving of the truck constitutes the principal part of the job. The same cannot be said about general freight hauling where it is understood that a great variety of freight is hauled, entailing more numerous stops and handling, which naturally reduce the number of miles a driver can make in a given time. A very striking difference in the two types of trucking is readily apparent. Similarity in the two jobs exists only to the extent that on both, driving of a truck is required.

From the observations made, it is our conclusion that on plaintiff's second cause of action there is a complete failure of proof in that he did not prove that the going wage for hauling gasoline was three and one-quarter cents per mile; on the contrary, the evidence conclusively shows that he was paid the regular customary wage paid to drivers of gasoline trucks in the vicinity of Great Falls, and that there were no wages paid to men in similar capacities other than the amount paid by defendant to plaintiff and the other employees in like positions.

For the foregoing reasons the judgment of the district court is affirmed as to the first cause of action, and reversed as to the second, each party to pay his own costs on this appeal. The costs in the district court shall be subject to the jurisdiction and order of that court.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ERICKSON concur.