## VAN DE PUTTE et al. v. TEXAS PACIFIC COAL & OIL CO. et al.

### No. 3046.

District Court, D. Montana.

Sept. 4, 1940.

E. J. McCabe, H. C. Hall, and Edw. C. Alexander, all of Great Falls, Mont., for plaintiffs.

La Rue Smith, of Great Falls, Mont., and William K. Hall, of Fort Worth, Tex., for defendants.

PRAY, District Judge.

The above-entitled suit is for an accounting and for the interpretation of certain provisions relating to expense under an agreement executed October 28th, 1922, between Homestake Exploration Corporation, hereinafter referred to as Homestake, as party of the first part, and the above-named plaintiffs, as parties of the second part. Homestake was succeeded by Texas Pacific Coal & Oil Company, hereinafter called Texas Company, by assignment of said agreement dated November 28th, 1927. The agreement provides for the development of certain consolidated oil and gas permits in the Kevin-Sunburst section of Toole County, State of Montana.

█ Homestake, a corporation, engaged in the drilling and operation of oil and gas wells, agreed to develop the lands embraced within these permits according to the terms of the said agreement. Homestake is to stand the expenses of drilling the first well and, if production is obtained, "shall be reimbursed for the expense of drilling said well out of the proceeds therefrom * * * but not otherwise." Further provisions respecting all wells drilled by Homestake are that they: "Shall be drilled at its own expense, but shall be reimbursed for the said expenses of drilling out of the net production obtained from the lands"; "The net proceeds of all oil and/or gas produced and saved" after payment of royalties "and after paying the expenses of the drilling operation conducted upon said land, shall be divided equally between the parties * *." Another important provision relating to expense is found in paragraph 7 of the agreement, as follows: "It is expressly understood and agreed that the term 'expense of drilling' or the term 'expense' where used herein to denote the expense of sinking a well for the purpose of producing oil and/or gas, shall be defined to mean only the actual cost and expense of drilling, equipping and placing all wells in a state of production and such other expense as may be necessarily incurred in development and operation of said wells, and of maintaining them in a state of production, with an additional ten per cent (10%) thereof added thereto for administrative, engineering and overhead expenses." In another part, paragraph 8, Homestake agrees to furnish second parties an accurate and detailed statement of its expense incurred in carrying on any and all of the operations provided for in the agreement. According to defendant operations under the agreement were begun immediately, and twenty wells were drilled, of which eleven were dry holes and two were gas wells; that the value of production, after paying royalties, amounted to $239,578.14 of which plaintiffs have been credited with one-half, or $119,789.07; that the net cost of operations, after making credit adjustments for transferred property, equals $268,250.97, of which plaintiffs have been charged with one-half, or $134,125.59; plaintiffs have also been charged with their one-half of the expense of 10 per cent. additional under the overhead provision, which amounts to $14,352.26; that expenses incurred in drilling and operating the wells exceed the net income by $57,377.56, of which sum one-half, or $28,688.78, has been charged to plaintiffs' interest in future production. While the record shows that there have been no net proceeds for division, defendant calls attention to the fact, as a response to plaintiffs' charge of inequitable interpretation of the agreement to their detriment, that as damages for an alleged breach of another provision of the same agreement relating to failure of defendant to drill additional wells, the plaintiffs through an action in the Montana state courts collected the sum of $87,632.36 from this defendant. But the questions for determination here relate to expenses incurred under the agreement and the proper interpretation of the language relating thereto, the court having heretofore held, in effect, that the language is difficult of interpretation, uncertain and ambiguous, and should be subjected to explanation by the parties or their representatives and by persons experienced in the oil and gas industry, and especially in like or similar circumstances. The amount of testimony given by persons termed experts, considered in connection with their varying opinions, would seem to indicate that the court was not in error in allowing the introduction of parole evidence to explain the meaning of the language relating to expense in the agreement, and also the understanding and intent of the parties just before and at the time of entering into the agreement. It seems quite clear that the account here involved could not be considered an account stated as objections were made to it from time to time and assurance was given that wherever mistakes or improper charges occurred they would be subject to future adjustment.

The parties agreed that all expenditures were actually incurred and are fair and reasonable in amount. The only question is whether plaintiffs are properly chargeable with one-half of all the expense set forth in the account. Defendants claim there has been no change in the records other than corrections of errors that have been discovered from time to time, and that copies of statements furnished currently to plaintiffs have been destroyed by fire; that all expenditures were charged to the joint account, and an additional 10 per cent. was added for administrative, engineering and overhead expense. Plaintiffs allege that the contract means that they contributed their interest in the land to the joint venture in return for defendant's contribution of its physical assets, such as rigs, derricks, drilling tools, tanks, pipe and other things necessary to the conduct of drilling operations,

and that the parties agreed that no expense should be charged to joint account except labor costs and the cost of equipment within the wells and below the casinghead, such charges to be payable out of production. Defendant claims that the language of the written agreement standing alone fails to support either of these propositions. Plaintiffs contend that the language of the written agreement is ambiguous and that some limitation must necessarily be placed upon the expense to be chargeable to the joint account and that therefore they may resort to parole agreements before and at the time of entering into the contract.

The position of defendant is that it, and its predecessor, assumed the entire risk of the joint venture in consideration of plaintiffs' contribution of their interest in the land, and that the language of the written agreement is clear and unambiguous, and expressly authorizes all the charges that have been made to the joint account, and furthermore, that the evidence offered by plaintiffs is either consistent with defendant's interpretation of the agreement or else is so inconsistent as to be incompetent under the parole evidence rule, and further that the testimony of practical oil men supports defendant's theory.

In considering the provisions of the agreement in regard to "expense of drilling" and the term "expense", and other related language therein, in connection with the interpretation thereof by the witnesses, it becomes the duty of the court to determine what items of expense were properly chargeable under the terms of the agreement and the explanatory evidence; in other words, what did the parties mutually agree should be chargeable as expense in these drilling operations. Reference has been frequently made to the Brown case, (Brown .v. Homestake Exploration Corporation, 98 Mont. 305–338, 39 P.2d 168, 179), heard in the District and Supreme Courts of the State of Montana, arising over the alleged failure to drill other wells under this same agreement and involving also the question of expense of drilling operations as a measure of damages. The Supreme Court, in deciding this case, had occasion to pass upon the items of expense that would be properly chargeable as an element of damage under the language of the same agreement that confronts the court in the instant case.

It would seem that the opinion of the Supreme Court in the Brown case, in view of its experience in dealing with oil and gas litigation, and in respect to the identical agreement before us, might be enlightening. Apparently the plaintiffs in this case take the same position in respect to expense that they did in the Brown case, and their views were accepted and approved by that court. In fact, the defendant also stipulated as to the items chargeable as expense in considering measure of damages, so that both sides appear to have been somewhat in accord in that respect. The plaintiffs here claim that they are contending for the same expense charge as in the Brown case, and that they have not changed their position, which they contend is the same as they mutually agreed and understood would be adopted at the time of entering into the agreement, and which would seem to indicate that some of the items charged up to expense should be eliminated from the account. The attitude of both parties in the other case and the statements of the plaintiffs in this case, with considerable support found in the testimony of the other witnesses, would strongly incline one to the belief that the plaintiffs have been subjected to improper charges in the joint account, if the court should hold to the position heretofore indicated.

Again referring to the Brown case where the cause of complaint was that the defendant failed to drill the additional wells provided for in the agreement. In that case the Supreme Court said: "Applying these recognized principles, the only feasible rule by which the damages sustained can be measured is the cost of drilling the well or wells agreed to be drilled. The amount of damages can be established with reasonable certainty. The cost of a well does not include the value of the machinery, equipment, and casing used in drilling it, which is removable from the premises in case operations result in a dry hole." Although the Brown case had relation to a different part of this agreement, the court's holding as to what constitutes the cost or expense of drilling a well would seem to have some application to the language the court is required to interpret in this case. The evidence convinces one that plaintiffs were dissatisfied with the charges made from the beginning as not being in accordance with the understanding of the parties which was, before the agreement was executed, that this was not to be like the Merkel-Dawson-Mid Northern agreement wherein nearly everything was charged to the parties furnishing the land; that defendant had equipment on

hand and was to furnish it and drill, and the plaintiffs were to furnish the leases, share the expenses described and divide the profits, if any, on a fifty-fifty basis. Defendant's counsel mention the permits as of negligible value, but it appears that the trustees had been offered $68,000 by one syndicate, and had received other similar offers, and that they regarded the permits as covering practically proven oil-bearing lands. It is rather difficult for the court to understand how such an interpretation, as plaintiffs claim was intended, would do violence to the quoted language of the agreement on the subject of expense. Under that language it would seem that nearly everything having any connection with the drilling of a well has been charged against the plaintiffs in the joint account, and no matter how much oil was produced, the plaintiffs might find themselves no better off at the finish than they were in the beginning, unless some limitation was placed somewhere on this apparently unrestrained charging power of the defendant.

There is much evidence throughout the case, even from defendant's side, that lends conviction to the theory of the plaintiffs that there was an understanding about the extent of these charges, and that there were certain fixed limitations as to expense, and that the representatives of the defendant agreed from time to time, as complaints were made, to make adjustments and corrections in the joint account pursuant to such understanding had at the inception of the agreement. By stipulation of the parties the defendant filed itemized statements of the total expense from beginning of the performance of the agreement to October 31st, 1939. Exhibits A and B. The latter exhibit stipulates that all expenditures be classified into 39 groups; these are again divided into four groups, as follows: a, b, c and d. The parties agree that all items in group "a" are properly chargeable to the joint account. As to the items in group "b", while plaintiffs are not willing to admit that they are "strictly chargeable", still they are willing to allow them. Plaintiffs claim that item "c" is chargeable to them alone, and that items in the "d" group, appearing in classifications 19 to 38, are not chargeable to the joint account. The statute of Montana sets forth a number of familiar rules for the interpretation of contracts, for instance: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Sec. 7527, R.C.M. Other pertinent sections intended to aid in such interpretation are Sections 7528, 7532, 7535, 7538, 7540, 7545 and 10521.

It seems reasonable to the court that all claims for consideration in this case should be limited to the date of assignment by Homestake to defendant and subsequently, such would appear from the correspondence and stipulation of the parties dismissing as to Homestake Corporation.

The court has already referred to the claim of account stated, and is satisfied that the evidence does not sustain such claim; the account was subject to change and adjustment from time to time and never appeared to be final.

Laches is a defense interposed by defendant and quite strongly urged. The principal reason given for delay is that plaintiffs were hoping for an adjustment of their claims, and their hope was based upon repeated assurances that their complaints would be considered, mistakes corrected and adjustments made. There does not appear to have been such an unusual change in material circumstances as to render it inequitable to grant relief to the party dilatory in commencing the suit; as a matter of fact, from the evidence, fault for delay seems to be attributable to both parties.

From a consideration of the files, pleadings, and briefs in this case, and the facts as they appear to the court, and the law governing, the court has come to the conclusion that the charges embraced in classifications 19 to 38, inclusive, should not have been entered against the plaintiffs, and should therefore be eliminated, and judgment awarded accordingly in favor of plaintiffs, with costs, and such is the order here. Findings of ultimate facts and conclusions may be submitted conformably to these views.