**POTLATCH OIL & REFINING CO. et al.**
**v. OHIO OIL CO.**

Civ. A. No. 956.

United States District Court
D. Montana, Great Falls Division.

Jan. 22, 1951.

E. J. McCabe, Great Falls, Mont., for plaintiffs.

Louis P. Donovan, Shelby, Mont., W. H. Everett, Casper, Wyo., for defendant.

PRAY, Chief Judge.

The above named corporations, including the trustees of the common law trust, plaintiffs and defendant, assisted by able counsel, accompanied by voluminous records and briefs, are here engaged in an effort to reform, or prevent the reformation, of a written agreement between the parties, or their predecessors in interest, for the development of oil and gas lands, in Glacier County, Montana, entered into over a quarter of a century ago; out of which the plaintiffs are said to have been paid under the terms of the agreement over $400,000 and the defendant has received therefrom over $500,000; the latter having undertaken the hazard of drilling the first well on the lands described in the agreement—free of all cost to the plaintiffs, or

their predecessors in interest. They were all "oil men" and engaged in leasing and developing lands for the recovery of oil and gas, and knew, or should have known and understood, the forms and terms of oil leases and contracts of that kind in general use in the field of their operations, and should therefore be distinguished from persons engaged in other pursuits, who have leased prospective oil lands for speculative purposes and who were not familiar with the details of oil leases and contracts and therefore are obliged to rely to a great extent on the interpretation placed upon such instruments by persons experienced in the oil and gas industry. So that, to begin with, in judging of parties and conditions it would appear that we are not dealing with neophytes in the development of oil and gas lands.

The written agreement in question here was made and signed June 15, 1922, by and between Troy-Sweetgrass Oil Syndicate, a common law trust, hereinafter known as Troy, as party of the first part, predecessor in interest of the above named plaintiffs, and The Ohio Oil Company, hereinafter known as Ohio, as the party of the second part, by the terms of which written agreement the first party sold and assigned to second party an undivided 55% interest in and to the leases and lands therein described, being Tracts 152, 153, 154, 155 and 156 on Map marked Ex. W, Tr. 255. Ohio took possession of the said lands in July, 1922, and drilled for oil and gas, which resulted in production of oil in commercial quantities.

On June 1, 1923, Troy assigned an undivided one-half of its remaining 45% interest in the "Baker Lease" to Inland Empire Oil and Gas Syndicate, known hereinafter as Inland. August 18, 1923, Troy assigned all of its interests in all of the leases and lands described in said agreement, including the remaining 22 1/2% interest in the Baker Lease, to Potlatch Oil and Refining Company, hereinafter referred to as Potlatch.

The principal bone of contention on the part of plaintiffs seems to arise over interpretation of paragraph III of the agreement which provides: "In the event that the well described in paragraph two herein above shall prove a commercial well, the party of the second part shall continue the work of developing and operating said premises in as diligent a manner as field and market conditions warrant and as is consistent with good business management. It will pay all costs and expenses of developing and operating said lands for oil and gas purposes, as herein provided, and shall charge the said party of the first part Forty-five (45%) per cent thereof. Second party shall market all oil and gas produced upon said land and account to the party of the first part for the undivided Forty-five (45%) per centum of the proceeds thereof at the prevailing market price at the wells for said oil and gas after deducting all royalty oil and gas or the proceeds thereof. The said party of the second part shall be reimbursed by the said party of the first part solely from the first party's proportion of the oil and gas produced and sold from said land. Application from proceeds from sale of said oil and gas will be made to the credit of the first party's account upon the first day of the month following that in which said oil and gas is sold, but in no case shall said party of the first part be finally held or charged beyond its share or interest in the production and equipment from, in or upon said lands. The party of the second part shall be entitled to and shall charge the party of the first part eight (8) per centum interest upon all moneys so advanced for the development and operations upon said lands for the account of the interest of the first party's until the same shall have been paid out of the proceeds of the party of first part's proportion of the oil and gas produced and sold as herein provided, said interest payments to be also paid out of production."

"IV. The party of the second part hereby agrees to render the party of the first part monthly statements showing the actual cost and expenses of developing and operating said lands and leases and will remit monthly to the party of the first part all proceeds of the oil and gas sold from the interest of the first party over and above the amount necessary to reimburse the party of the second part for expenditures

made by it for the account and interest of the party of the first part."

"V. The party of the first part through its duly authorized agents or representatives shall at all reasonable times have access to the buildings, lands and property hereinabove for the purpose of examining the operations thereon and the production therefrom, and at all reasonable times during business hours shall have the right to examine the books and records of the party of the second part insofar as they pertain to the operations conducted under this agreement."

It appears that all monthly statements required by paragraph IV were furnished to Troy beginning with August, 1922, and thereafter to its assignees, Potlatch and Inland.

It appears that all payments were made according to agreement, and that wherever an error or mistake occurred a correction was made, and that all checks and vouchers were received by plaintiffs, and that all such checks were cashed; there seems to be little if any dispute in respect to bookkeeping and payments by Ohio. The first complaint about overcharges seems to have come from Inland September 11, 1923, to the effect that "overhead expenses" and other charges were improperly included in monthly statements; on September 22, 1923, Ohio answered by letter and rejected Inland's claim and held that all charges were properly made according to the written agreement.

Counsel for plaintiffs wrote Ohio on July 17, 1925, objecting to charges made, demanding a correction and proposing a conference for a settlement of disputes in lieu of suit. Ohio responded July 21, 1925, in a letter to plaintiff's attorneys that "while we feel that the charges were carefully prepared and are entirely justified, representatives of the company will be glad to meet you and discuss with you fully and frankly any items your companies are complaining of. * * *" The meeting occurred on August 7, 1925, and as a result plaintiffs' attorneys agreed to furnish Ohio with written objections to its charges, and complied on the following day. On September 12, 1925, Ohio replied, refusing to make any changes in its charges, and gave reasons therefor.

From a stipulation of facts dated October 28, 1949, it appears that F. E. Hurley, who negotiated and signed the agreement, representing the Ohio, died more than 18 years prior to the commencement of this action; that A. M. Sellery, who negotiated and witnessed the agreement on behalf of Ohio, died more than 20 years prior to this action; that F. R. Firmin, who rejected plaintiffs' contentions in 1925 on behalf of Ohio, died about 5 years prior to this action, and that John McFadyen, Division Manager, Rocky Mountain Division, of Ohio, died more than 3 years prior to commencement of this action.

According to defendant "No reply or further action was heard from or taken by plaintiffs to the type of charges made under this agreement until May 20, 1936 and June 9, 1936", when plaintiffs wrote a letter to Ohio objecting to charges made on account of certain automobile and trucking expenses, holding that such charges were not within the letter or spirit of the agreement under which Ohio was operating. On July 1, 1936, Ohio replied to plaintiffs' complaints objecting to the foregoing charges and refused to make any change in such charges.

It appears that nothing more was heard from plaintiffs nor was any action taken about complaints made of improper charges by Ohio until the spring of 1946, which is said to have been more than three years after Ohio had sold and disposed of its entire interests in the agreement to The Texas Company. At the time aforesaid, spring of 1946, counsel for plaintiffs asked Ohio for an accounting and settlement of improper charges alleged to have been made under the terms of the agreement, and which had been presented to Ohio for adjustment and settlement by plaintiffs on different occasions in 1923, 1925, and 1936, and had been refused in each instance as was the proposal in the spring of 1946. The following spring this action was commenced.

■ Ohio offered evidence that it had other agreements like the one in suit with

other persons in the Glacier County oil fields, and of the same date, June 15, 1922, had other like agreements with Troy and Potlatch covering other leases, and that no complaints were made about them. Plaintiffs objected to any evidence of other leases by Ohio, and the court will sustain the objection, such evidence apparently serving no material purpose.

The motion by defendant to dismiss the suit was denied with the right reserved of renewal at the time of trial; one of the questions raised therein was that the suit is barred by the statutes of limitation, and this seems to present an important issue, and especially so since hearing the evidence given at the trial.

As to the language of the agreement in controversy there seems to be no difficulty in understanding its meaning, and it should be remembered that the parties entering into this agreement were engaged in the production of oil and gas, and familiar with the terms of contracts and leases relating to such industry, and knew or should have known the meaning of the language contained in the agreement to which they affixed their signatures. The court has stated that the language in question is plain, but that does not mean that it may not have been misused in the sense that it might enable the defendant to indulge in an unlimited expense account; having control of the purse strings of production defendant could charge to the account of plaintiffs items that had to do either proximately or remotely with "all costs and expenses of developing and operating said lands for oil and gas purposes". But defendant has insisted from the beginning that all charges have been properly made.

This case bears some resemblance to the Van De Putte case, Van De Putte v. Texas Pacific Coal & Oil Co., discussed by counsel in their briefs, and found in 35 F. Supp. 794, 797, wherein this court said: "Under that language it would seem that nearly everything having any connection with the drilling of a well has been charged against the plaintiffs in the joint account, and no matter how much oil was produced, the plaintiffs might find themselves no better off at the finish than they were in the beginning, unless some limitation was placed somewhere on this apparently unrestrained charging power of the defendant." There the accounting of defendant found the plaintiffs deeply in debt, and the court decided that improper charges had been made in the account. That case was decided by this court in favor of plaintiffs; was appealed and before the appeal was considered by the higher court, a settlement occurred and the appeal was dismissed. The phraseology of the Van De Putte agreement was much different from this case; in that case the plaintiffs, lessors, were repeatedly assured over a long period of time by the defendant, lessee, that they would get together and consider the charges, and that all proper adjustments would be made, but the lessee never kept its agreement to make good these assurances, and finally the plaintiffs brought suit, and the parties stipulated that defendant would submit an account of all charges made under the agreement for determination by the court; this was done and the court eliminated all charges deemed to be improper under the agreement; the defense of laches and limitation of actions was pleaded by defendant, but was denied by the court. If any laches existed in that case, the court held that both sides were equally blameable.

The testimony of Mr. Jones seems to relate to a different agreement from the one at issue in this case; as it appears to the court no such interpretation or understanding as he has suggested could be entertained without writing a new agreement; such a modification could only have been made by another agreement in writing or by any executed verbal agreement; nor could the purported verbal statements of the deceased Ohio representative have been effective to toll the statutes of limitations unless they were submitted in writing. Sec. 93–2716, R.C.M. 1947. From all the evidence and rules that appear applicable it does not seem that this testimony is necessary to prevent an injustice being done in this case. Sec. 93–701–3; Phelps v. Union Central Life Ins. Co., 105 Mont. 195, 71 P.2d 887; Langston v. Currie, 95 Mont. 57, 26 P.2d 160; Wilcox v. Schissler,

55 Mont. 246, 175 P. 889; Armington v. Stelle, 27 Mont. 13, 69 P. 115; 93–401–13, R.C.M. 1947. This court cannot write a new agreement for the plaintiffs 28 years after it was entered into by the parties, when such agreement was stated in plain terms and was made, and read, and signed by intelligent and experienced operators in this particular line of industry.

■ Having considered the arguments in favor of and in opposition to the admission of the testimony of Mr. Jones, and numerous authorities cited by counsel for the respective parties, the court is now of the opinion that the objection thereto should be sustained and such will be the order of court herein. Even if this testimony were admitted it could be of little probative value as affecting the bar of the statute of limitations, since a continuous and unvarying course of conduct on the part of the defendant has been established by convincing proof over a period of about 25 years during which defendant refused to make any such changes in its charges as were requested by plaintiffs or their representatives.

■ It appears that plaintiffs finally brought suit in 1947, after all but one of the representatives of defendant who had participated in the making of or execution of the agreement, or had any definite knowledge concerning it, had died. In the court's opinion this is a tardy suit and the laches of plaintiffs and the statutory limitations cited by counsel would bar recovery under plaintiffs' claim. From a perusal of the facts and contentions of counsel the court is unable to agree that this undertaking constituted a joint adventure and thereby imposed obligations upon defendant as a trustee for plaintiffs.

A long discussion ensued on the part of counsel on the subject of an account stated which arose over the monthly statements and payments by defendant to plaintiffs, and many authorities have been cited by counsel in support of their respective views. Upon examination of authorities it would appear that when plaintiffs accepted the monthly statements, entered into settlements thereof and accepted payments there-for, over a period of many years, in the sum total of about $400,000, well knowing that defendant had repeatedly refused to make any changes in its charges such as plaintiffs proposed, and that the latter was bound to know that the intention was to make the payment in full settlement, it would seem that the rules governing the interpretation of an account stated would favor the defense in this case, as appears to be indicated by the greater weight of authority. Norum v. Ohio Oil Co. et al., 83 Mont. 353, 272 P. 534; McKnab-Bess Oil Co. v. Commonwealth Oil & Gas Co., 142 Kan. 739, 52 P.2d 363; Jensen v. Cloud, 107 Mont. 593, 88 P.2d 36; Sawyer v. Somers Lumber Co., 86 Mont. 169, 179, 282 P. 852.

In view of the foregoing it becomes apparent that the court is of the opinion that the defendant should prevail in this suit, accordingly findings of fact and conclusions of law, and form of judgment may be submitted; costs go to defendant. Exceptions allowed plaintiffs.